**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**GEORGINA MACKIE,**

      **Plaintiff,**

**vs.**                                                           **Case No. 1:07cv98-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and benefits be awarded.

**Procedural status of the case**

      Plaintiff, Georgina Mackie, applied for disability insurance benefits.  Plaintiff was 37 years old at the time of the alleged onset of disability (January 1, 2003), has a high school graduate equivalency degree, and has past relevant work as a bank teller and data entry clerk.  Plaintiff alleges disability due to fibromyalgia.

The Administrative Law Judge found that while Plaintiff can no longer do her past relevant work she had the residual functional capacity to do other jobs in the national economy (small parts assembler, clerical support worker, and interviewer) and was not disabled as defined by Social Security law.  The Appeals Council found that Plaintiff could do her past relevant work as a bank teller.  Plaintiff contends that the ALJ did not give proper weight to the opinion of the treating physician.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

Plaintiff testified that she used to be neat in her housework, but that she no longer could do housework except "sporadically."  R. 335, 336.  She said that she cleaned in stages, with rests in between.  *Id.*  Her daughter helped out, and she said "there's not a lot of it that I can do myself.  If it wasn't for my daughter, the house would be really a mess."  R. 335.  Plaintiff said she does not visit her parents a lot anymore, like she used to do.  R. 337.  She said she cried a lot.  *Id.*  She was able to shop for groceries, but that aggravated her pain.  R. 339.  She usually took someone with her to shop.  R. 342.  She was able to drive a car, but her husband drove her to the hearing. *Id.*  She could do light cooking, but she said her family ate out a lot.  R. 343.  She could dress and bathe herself.  *Id.*

The vocational expert was given several hypotheticals.  R. 345-355.  The

vocational expert did not testify to any transferrable skills from Plaintiff's prior work, R.

23, and therefore only unskilled jobs were considered.  The expert said that

> [m]ost sedentary, unskilled type of work requires an individual to remain
> seated for at least two hours at a time, six hours in an eight-hour day, and
> wouldn't necessarily provide for a sit/stand option, because it's usually
> going to have to do with a time basis and piece work.

R. 350.  The expert was given the following hypothetical (among others):

> An individual can sit, stand, or walk less than two hours in an eight-hour
> workday, and of that, sitting is no more than one hour, and standing is no
> more than one hour.  And the individual must walk one hour during that
> period of time.

R. 350-351.  As discussed ahead, these are the limitations found by Plaintiff's treating

physician, Dr. Lloyd.  R. 238.  The vocational expert said that a person with those

limitations could not do Plaintiff's past relevant work or "any other type of work as it's

performed in the national, regional, and local economy."  R. 351.

**Medical Evidence**[1]

On July 29, 2002, Plaintiff was seen by Oscar B. DePaz, M.D., with a complaint

of lower back pain.  R. 167-169.  She also said she had fatigue in her legs, and a

burning, sharp dull pain in her thigh.  R. 167.  The symptoms had gotten worse in the

prior six months.  *Id.*  Upon examination, she had significant pain in neuroforaminal

compression without radiation.  R. 168.  Other tests were negative.  *Id.*  An MRI was

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS'
DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS
DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >.
Information about medical terms and prescription drugs come from DORLAND'S
ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical
Dictionary link).

ordered.  R. 169.  Bextra[2] was prescribed.  *Id.*  The MRI of her lumbar spine on August

6, 2002, was negative.  R. 155.

On August 22, 2002, Plaintiff returned to Dr. DePaz.  R. 166.  She had soreness

in her back, but she had less weakness of her legs.  *Id.*  Bextra was discontinued and

Zanaflex[3] was initiated, as well as ice or moist heat, and "activity as tolerated."  *Id.*  An

EMG was contemplated "to further assess weakness and muscular fatigue."  *Id.*

On October 17, 2002, Plaintiff returned to Dr. DePaz.  R. 164.  She said she had

been doing housework and began to experience left lumbar pain.  *Id.*  She went to the

hospital and received Prednisone,[4] but it did not help.  *Id.*  She was referred to physical

therapy and a trial of amitriptyline[5] was prescribed to "restore stage IV sleep and

moderate pain response."  *Id.*  Vicodin[6] was prescribed for pain.  R. 165.

On November 19, 2003, Plaintiff was seen again complaining of low back pain

and "probable left SI dysfunction."  R. 163.  She reported pain from 3 to 4 to 7 to 8 on a

---

[2] Bextra contains valdecoxib, a nonsteroidal anti-inflammatory drug (NSAID).
PHYSICIANS' DESK REFERENCE (2003).

[3] Zanaflex relaxes the tense, rigid muscles caused by spasticity.  It is prescribed for
people with multiple sclerosis, spinal cord injuries, and other disorders that produce
protracted muscles spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[4] Prednisone is a synthetic glucocorticoid derived from cortisone, administered orally
as an antiinflammatory and immunosuppressant in a wide variety of disorders.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[5] Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is
also used for treatment of chronic pain.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[6] Vicodin is a brand name for hydrocodone.  Hydrocodone is a semisynthetic
narcotic derivative of codeine having sedative and analgesic effects more powerful than
those of codeine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

scale of 10.  *Id.*  She also reported weakness of her legs.  *Id.*  Amitriptyline and Vicodin

had been helpful and were continued.  *Id.*

On November 27, 2002, Dr. DePaz administered a left S1 joint block injection.

R. 162.  It provided only mild relief.  R. 161, 162.  On December 11, 2002,  another

injection was administered, and Plaintiff's pain after the injection (7 on a scale of 10)

was not changed.  *Id.*

On January 7, 2003, Plaintiff returned to Dr. DePaz.  R. 158.  Plaintiff's pain had

spread to her left upper back and neck area.  *Id.*  Plaintiff had completed her course of

physical therapy and was doing home exercises.  *Id.*  She was still working at Meridian

Behavioral Healthcare.  *Id.*  Since she continued to fail "to improve with conservative

modalities and lack of inciting event," Dr. DePaz proceeded to have a blood work up for

rheumatoid factor and other factors.  *Id.*  His intent was to rule out "systemic

arthritic/inflammatory process."  *Id.*

On January 27, 2003, Plaintiff returned complaining of "pain mostly in the left

side of the shoulder, neck, and upper arm."  R. 157.  She had an appointment with Dr.

Lloyd for a rheumatological evaluation.  *Id.*  On examination, she was found to have

pain "throughout the cervical and upper shoulder musculature with multiple tender

points.  There is tenderness over the bicipital tendon.  There is tenderness over the

biceps bilaterally."  *Id.*  Her strength was not diminished.  *Id.*

On February 6, 2003, Plaintiff was examined by T. Mark Lloyd, M.D., a

Rheumatologist.  R. 197-198.  Plaintiff reported that she had pain in her upper back,

worse on the left side, and upper arms.  R. 197.  Upon examination, Dr. Lloyd noted

nine fibromyalgia tender points of the 18 that are indicators of fibromyalgia.  R. 198.  On

February 20, 2003, noted that he suspected myofascial pain syndrome. R. 196. He found that Plaintiff had 18 of the 18 fibromyalgia trigger points. *Id.* He prescribed Elavil,[7] Soma,[8] and Lortab.[9] *Id.* On March 20, 2003, Dr. Lloyd found that Plaintiff was "having a difficult time even sitting in the chair in the room today," and was "hurting to move or shift in the chair." R. 193. Plaintiff reported that she was not sleeping well and was very tired. *Id.* He discontinued Lortab, prescribing Ultracet[10] and OxyContin,[11] and continuing Elavil and Soma. R. 194. He again found that Plaintiff had 18 of the 18 fibromyalgia trigger points. *Id.*

On April 17, 2003, Dr. Lloyd noted no significant improvement with pain and sleeping. R. 191. He found that Plaintiff had 18 of the 18 fibromyalgia trigger points,

---

[7] Elavil is an antidepressant with sedative effects; the active ingredient is amitriptyline HCL. PHYSICIANS' DESK REFERENCE (2005). Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[8] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Lortab is one of the brand names for hydrocodone. PHYSICIANS' DESK REFERENCE (2004), p. 3233. Lortab is said to be used to treat severe pain. Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

[10] Ultracet is a trademark for a preparation of tramadol hydrochloride and acetaminophen. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY. Ultracet is used to treat moderate to severe pain for a period of five days or less. It contains two pain-relieving agents. Tramadol, known technically as an opioid analgesic, is a narcotic pain reliever. Acetaminophen is the active ingredient in the over-the-counter pain remedy Tylenol. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[11] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance. It is used to manage moderate to severe pain when continuous, around-the-clock analgesic is needed for an extended period of time. PHYSICIANS' DESK REFERENCE (2005).

and continued the prior medications.  R. 192.  Plaintiff still had not responded to any

medication, and had "seemingly worse fatigue."  R. 189.  She was "still hurting all over,"

but had no joint swelling.  *Id.*  On examination, Dr. Lloyd noted severe pain in Plaintiff's

muscles.  R. 190.  He noted that Plaintiff was applying for disability, and he added

Baclofen[12] to her medications.  *Id.*  His diagnosis was "FMS [fibromyalgia syndrome],

not responding a great deal."  *Id.*

On June 12, 2003, Plaintiff reported her muscles were not as sore, and she had

a decrease in muscle spasms, but her hands and feet were swelling and she had weight

gain.  R. 187.  Dr. Lloyd began Elavil withdrawal, substituting Lexapro[13] for Elavil.  R.

188.  He prescribed Ambien,[14] walking, stretching, and exercise.  *Id.*  He again found

that Plaintiff had 18 of the 18 fibromyalgia trigger points, with moderate pain, and his

diagnosis was fibromyalgia syndrome.  *Id.*

On July 10, 2003, Plaintiff's pain was severe, with 18 of the 18 fibromyalgia

trigger points again noted.  R. 186.  It was noted that she had fatigue, muscle pain,

sleep disturbance, and psychosis.  R. 185.  The notation of "psychosis" by a check mark

was probably an error as that diagnosis or observation was not repeated in the medical

record.

---

[12] Baclofen is a muscle relaxant and an antispastic.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[13] Lexapro is an orally administered selective serotonin reuptake inhibitor used as an antidepressant, for treatment of major depressive disorder.  PHYSICIANS' DESK REFERENCE (2005).

[14] Ambien is indicated for short term insominia.  PHYSICIANS' DESK REFERENCE (2005).

On August 14, 2003, Plaintiff was doing no better.  R. 183.  She was not resting

well, and her pain level was 6 or 7.  *Id.*  The diagnosis was active fibromyalgia

syndrome.  R. 184.  Again, 18 fibromyalgia tender points were observed and noted.  *Id.*

On August 16, 2003, Plaintiff was examined by David Eckel, M.D., at the

Emergency Medical Center, on a consultative basis.  R. 199-202.  There is no evidence

in this report that Dr. Eckel consulted the medical records of Plaintiff's treating

physicians.  Plaintiff reported to Dr. Eckel that she was being treated for fibromyalgia.

R. 199.  She reported she was "able to perform full activities of daily living."  *Id.*  Her

medications included Premarin,[15] Oxycontin, Baclofen, Lexaplo [sic, Lexapro], Soma,

and Ulatracet [sic, Ultracet].  R. 199-200.  Dr. Eckel performed a physical examination,

noting a number of negative findings, including full strength without spasticity,

contracture, atrophy, or involuntary movement, but finding "diffuse tenderness across

the lower back mostly over the left sacral area joint."  R. 201.  It was noticed that

Plaintiff's gait was slow and shuffling, without picking up her feet.  R. 202.  Dr. Eckel's

conclusion from the SED rate and positive ANA test that it was "much more likely [than

a disc related problem] that she has some sort of connective tissue disorder."  R. 202.

He noted she was somewhat young to have "polymyalgia rheumatica," however.  *Id.*

He thought she was "certainly not a candidate for manual labor.  As her pain is no

worse sitting and standing, it is conceivable that she could do some type of office work."

*Id.*  He thought that a trial of a corticosteroid would be helpful for diagnosis.  *Id.*

---

[15] Premarin is an estrogen replacement drug.  PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

On September 10, 2003, Beth Ball, an employee of the Florida office of Disability Determination, determined that Plaintiff can do light work. R. 203-210. She did not examine Plaintiff and she was not a physician. *Id.* The only medical record cited was Dr. Eckel's examination. R. 205, 208. Likewise, on November 5, 2003, a non-examining physician, Donald Morford, determined that Plaintiff could do light work citing only Dr. Eckel's notes. R. 211-213. Neither referred to the medical evidence from treating physicians.

On September 11, 2003, Plaintiff returned to Dr. Lloyd. R. 181. There still was not "a great deal of change." *Id.* She had been caring for a seven year old. *Id.* She still rated "her distress around 6-7," and at times, 8-9. *Id.* Baclofen, Ambien, and Lexapro have not helped. *Id.* She had exercised more, and there was no joint swelling. *Id.* Dr. Lloyd added Neurontin[16] to Plaintiff's medications, and withdrew Soma. R. 182. Again, 18 fibromyalgia tender points were noted. *Id.*

On a visit on October 9, 2003, Dr. Lloyd noted that Plaintiff continued her diet and maintained her exercise program. R. 179. She was doing "a little better." *Id.* Moderate muscle tenderness was noted, as well as the 18 fibromyalgia points. R. 180. The dosage of Neurontin was doubled and the other medications continued. *Id.*

Plaintiff returned to Dr. Lloyd on December 4, 2003. R. 276. She continued to report that she was always tired, did not sleep well, hurt all over, and was in constant pain over a level 5. *Id.* She also said her legs were weak and wobbly. *Id.* She had no

---

[16] Neurontin is indicated for management of postherpetic neuralgia and as an adjunctive therapy in the treatment of partial seizures. PHYSICIANS' DESK REFERENCE (2005).

skin rash or joint swelling.  *Id.*  Dr. Lloyd continued to note all the fibromyalgia trigger points.  R. 277.

Plaintiff had increased pain and fatigue on January 16, 2004.  R. 274.  According to Dr. Lloyd's examination, the pain was severe.  R. 275.  Dr. Lloyd continued to note all the fibromyalgia trigger points and said her fibromyalgia was "flaring."  *Id.*  Elavil was added back.  *Id.*

On January 19, 2004, Dr. Lloyd completed a Medical Source Statement of Ability to do Work-Related Activities (Physical).  R. 233-235.  Dr. Lloyd said that Plaintiff could occasionally carry less than 10 pounds, and could only stand or walk for less than 2 hours in an 8 hour day.  R. 233.  He said that Plaintiff must periodically alternate between sitting and standing to relieve pain or discomfort.  R. 234.  He said that Plaintiff was limited in both upper and lower extremities.  *Id.*  Dr. Lloyd explained that these limitations were due to numerous trigger points, signs of fatigue, and Plaintiff's own description.  *Id.*  He determined that Plaintiff could not climb ramps or stairs, crouch, or crawl, and could only occasionally balance and kneel.  *Id.*  He said that Plaintiff was limited in reaching, handling, fingering, and feeling due to fatigue.  R. 235.  He said that temperature extremes and humidity affected Plaintiff's pain, and her fatigue limited her ability to work with machinery or heights.  *Id.*

Plaintiff was seen again by Dr. Lloyd on March 18, 2004.  R. 272.  Elavil had not been helpful to her.  *Id.*  She had been in "a lot of pain" the prior 2 to 3 weeks, and had ongoing fatigue.  *Id.*  She was stretching, exercising, and "trying" to walk.  *Id.*  Her fibromyalgia was deemed to be "severe," and "not responding a great deal."  R. 273.

The dosage of Neurontin was increased to 600 mg.  *Id.*  It had begun at 100 mg.  R. 182.

On May 13, 2004, Dr. Lloyd said that Plaintiff had a "severe expression of" fibromyalgia syndrome.  R. 270.  Neurontin was not working, and she went back to Elavil.  R. 270-271.  On July 8, 2004, Dr. Lloyd said that Plaintiff's myalgia was about the same.  R. 268.  Her level of pain was about 6, and she had "a lot of fatigue."  *Id.*  A trial of Topamax[17] was initiated.  R. 269.  Again, the 18 trigger points for fibromyalgia were found upon examination.  *Id.*

Plaintiff was seen by Dr. Lloyd on August 12, 2004.  R. 266.  He noted that she continued to struggle with fibromyalgia, and was trying hard "to find work as well."  *Id.*  She still had fatigue, pain, and decreased sleep.  *Id.*  The 18 trigger points for fibromyalgia were found upon examination.  R. 267.

Dr. Lloyd said that Plaintiff had "classic" fibromyalgia on September 9, 2004, with 18 of the 18 trigger points.  R. 264, 265.  Her medications were continued.  R. 265.

On October 7, 2004, Dr. Lloyd again said that Plaintiff's condition was "classical FMS."  R. 262.  He noted that she was not sleeping as well, and that Ambien was not working.  *Id.*  She thought that Topamax may be helping her pain.  *Id.*  She was "working again."  *Id.*  Dr. Lloyd decided to try Restoril.[18]  R. 263.  By the next visit,

---

[17] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures.  It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[18] Restoril is used for the relief of insomnia (difficulty in falling asleep, waking up frequently at night, or waking up early in the morning).  It belongs to a class of drugs known as benzodiazepines.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

December 2, 2004, it was found that Restoril had been as effective as Ambien for helping with sleep.  R. 260.  Plaintiff felt more fatigued but her pain level was stable at level 5.  *Id.*

Plaintiff was seen by Dr. Lloyd on January 27, 2005, reporting pain level at 5-6, and ongoing fatigue.  R. 258.  Her pain had increased by March 24, 2005, and she was not doing as well as the prior visit.  R. 254.  Again, as in all of the visits except the first one, Dr. Lloyd found that she had 18 fibromyalgia trigger points.  R. 255.

On April 21, 2005, Dr. Lloyd noted that Plaintiff had a two year history of myofascial pain and that multiple medications had been attempted.  R. 251.  She reported continuing pain, myalgias, and fatigue.  *Id.*  She was being seen monthly because Oxycontin was prescribed.  *Id.*

On May 27, 2005, Dr. Lloyd noted that Plaintiff had "severe myofascial pain," with associated fatigue and loss of sleep.  R. 249.  Her pain was about the same, at a 6 to 7 level.  *Id.*  Lunesta[19] was initiated as a trial instead of Ambien.  R. 249-250.  The 18 trigger points were noted after an examination.  R. 250.

Plaintiff was seen again by a physician's assistant Richard K. Huff and Dr. Lloyd on June 27, 2005.  R. 247-248 (see also R. 244).  The physician's assistant[20] appears not to have found any of the same 18 trigger points, if I am correctly reading the symbol

---

[19] Lunesta is prescribed for insomnia, defined as the inability to fall asleep or stay asleep. It's used for adults who have trouble getting to sleep, wake frequently during the night, or wake up too early in the morning.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[20] The handwriting is different from that of Dr. Lloyd.  Dr. Lloyd also saw Plaintiff at another time that day as scheduled the month before.  R. 250.

he used.  R. 248.  Nonetheless, the diagnosis of fibromyalgia syndrome was continued, and Dr. Lloyd signed the notes.  *Id.*

On July 27, 2005, Dr. Lloyd again noted classical fibromyalgia syndrome by history.  R. 245.  Plaintiff's pain levels (6-7) were unchanged.  *Id.*  Dr. Lloyd again found 18 of the 18 fibromyalgia tender points upon examination.  R. 246.

On August 24, 2005, Plaintiff was seen by physician's assistant Huff.  R. 243-244.  P.A. Huff found 14 of the 18 fibromyalgia trigger points and determined that the fibromyalgia was mild but increasing.  R. 244.  He found muscle pain and sleep disturbance, but no fatigue.  R. 243.

On September 12, 2005, Dr. Lloyd completed a Physical Residual Functional Capacity Questionnaire.  R. 236-240.  His diagnosis was fibromyalgia syndrome, with a guarded prognosis (prolonged).  R. 236.  He listed Plaintiff's symptoms as pain, fatigue, decreased sleep, decreased concentration, and depression.  *Id.*  He thought that she experienced pain at the 6-8 level, with diffuse muscle soreness and aching.  *Id.*  He noted "18+" trigger points.  *Id.*  He said that Plaintiff's pain medications and muscle relaxers made her drowsy.  R. 237.  Dr. Lloyd said he doubted that Plaintiff was a malingerer.  *Id.*  He thought that emotions and stress play a great role in fibromyalgia syndrome.  *Id.*  He identified depression and Plaintiff's physical condition as affecting her physical condition.  *Id.*  He said that Plaintiff "frequently" experiences pain and other symptoms severe enough to interfere with her attention and concentration.  *Id.*

Dr. Lloyd felt that Plaintiff's ability to deal with work stress was markedly limited.  R. 238.  He thought that Plaintiff might continuously sit for only one hour and stand for

only one hour at a time.  *Id.*  He said that she could sit or stand alternatively less than 2 hours in an 8 hour day.  *Id.*

Dr. Lloyd said that Plaintiff would have to take frequent unscheduled breaks in an 8 hour day.  R. 239.  He said she could occasionally lift less than 10 pounds, and could not frequently lift any weight.  *Id.*  He thought that she could use her hands to grasp, her fingers in fine manipulation, and her arms in reaching, each only 10% during an 8 hour day.  R. 239-240.  He said that Plaintiff would be absent from work more than 3 times a month due to her impairments.  R. 240.

Dr. Lloyd also filled out physician interrogatories regarding fibromyalgia.  R. 241-242.  He said that Plaintiff had a history of widespread pain, and said that Plaintiff had 18 of the 18 fibromyalgia trigger points for pain.  R. 241.  He said that her pain was continuous at a level of 6 to 8.  *Id.*  He stated that Plaintiff had muscle spasm as an objective sign of pain.  *Id.*  He noted the following subjective indicators of pain: complaints of pain, sleeplessness, irritability, and poor interpersonal relationships.  R. 242.  He said that any activity and any constant maintenance of position incited pain.  *Id.*  He said that Plaintiff's medical condition is reasonably expected to produce moderate to severe fatigue, and to produce a moderate to severe impairment.  *Id.*

**Legal Analysis**

Plaintiff contends that the Commissioner, acting through the Administrative Law Judge, did not give proper weight to the opinions of Dr. Lloyd, Plaintiff's treating rheumatologist.  The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence. Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the:  (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004).  The ALJ must clearly articulate the reasons for rejecting the treating physician's opinion.  *Id.*, at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

"Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[21]  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court there said:  "Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id.*  A patient's subjective complaint "is an essential diagnostic tool" for the treating physician.  *Id.*, *quoting* Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).  Moreover, it is relevant to the weight of a treating physician's opinion that he or she have "personally monitored the effectiveness of various therapies and found that they failed to provide any significant improvement . . . ."  *Id.  See* Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating physician's opinion not conclusory when it was the "culmination of numerous visits [plaintiff] had with her past doctors, and his experience with treating her chronic pain.").

It is a misunderstanding of the nature of fibromyalgia to require " 'objective' evidence for a disease that eludes such measurement."  Green-Younger, 335 F.3d at 108.  "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which

---

[21] The court there found that the administrative law judge had an "all pervasive misunderstanding of the disease," finding inappropriate that the ALJ criticized the claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist, or psychiatrist."  78 F.3d at 307.

can conclusively confirm the disease.' " *Id.* (citations to cases from the 6th, 8th, and 9th Circuits omitted).  "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."  *Id.*, at 108-109. "[S]welling of the joints is not a symptom of fibromyalgia . . . ."  Sarchet, 78 F.3d at 307.  *See also* Brown v. Barnhart, No. 05-5143, 2006 WL 1431446, *2 and n. 1 (10th Cir. 2006) (unpublished).

The Eleventh adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000).  In Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005), while acknowledging that Stewart is not binding precedent, the court also adopted this reasoning:

> In *Stewart*, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on a individual's described symptoms.  Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment. *Id.* 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.

405 F.3d at 1211 and n. 3.

Moore, like Stewart, was not a case dealing with the opinion of a treating physician.  Instead, the issue there was the credibility of the claimant.  Moore held that the

> absence of laboratory evidence was not the basis for the ALJ's own negative credibility determination.  Unlike the situation in *Stewart*, where the lack of objective findings formed the basis for the adverse credibility determination, the ALJ here relied on the inconsistencies between Moore's descriptions of her diverse daily activities and her claims of infirmity.  More specifically, the ALJ questioned Moore's contentions that she could not maintain consciousness or perform light work, in light of her ability to drive, provide childcare, bathe and care for herself, exercise, and perform housework.

405 F.3d at 1212.

Phillips v. Barnhart, on the other hand, is a fibromyalgia case (among other claimed impairments) where the opinion of the treating physician was at issue.  The court affirmed the ALJ's findings that the treating physician's opinion was contrary to his May 3, 1999, treatment notes and the claimant's own testimony as to the extent of her daily activities.  357 F.3d at 1241.  On May 3, 1999, the treating physician had found that Plaintiff " 'overall felt good' with "intermittent fatigue, depression, LBP [lower back pain], [and] pain in hips, thighs, and knees.' "  Id.  These findings were quite different from the residual functional capacity assigned to the claimant by the same physician a year later.  Id.  Further, the court did not mention any other medical note from this treating physician other than the May 3, 1999, note, even though he had treated the claimant since 1993.  Likewise, the claimant's report of her own daily activities (household chores, dining out, visiting with friends, shopping, long trips away from home by car and airplane, walking, lifting weights, and doing water aerobics) was found to be substantial evidence to discount the treating physician's opinion.  Id.

In the case at bar, the Administrative Law Judge set forth the following reasons for discounting the opinion of Dr. Lloyd:

> While Dr. Floyd [sic] may have a treating relationship with the claimant, the record reveals that the diagnosis of fibromyalgia has been provisional only; that her treatment has been infrequent, having been seen only every 2-3 months, and that she has been treated conservatively.
>
> Also, Dr. Floyd apparently relied in part on the subjective report of symptoms and limitations provided by the claimant as his own clinical data includes few actual objective findings to support such a limited residual functional capacity.  I also note that such finding is not consistent with Dr. Floyd's treatment records in which he repeatedly recommends that the claimant continue to lose weight and 'exercise' (Exhibit 12F).  Moreover,

his findings are not consistent with those of examining physician Dr. David
Eckel, whose opinion I give greater weight as it is more consistent with the
treatment evidence of record.  Dr. Floyd's opinion regarding the claimant's
ability to perform work-related activities is therefore not well supported and
is inconsistent with the other substantial evidence of record, and is
therefore given minimal evidentiary weight under the provisions of 20 CFR
404.1527(d).

R. 22.

The findings in the first paragraph above are not supported by substantial

evidence in the record.  Dr. Lloyd had a treating relationship with Plaintiff from February

6, 2003, to September 12, 2005, a period of two and one-half years.  He did not see

Plaintiff infrequently.  He examined her 25 times by Plaintiff's count, confirmed by the

evidence discussed above, and prescribed a large number of significant pain

medications.  There was not a day that Plaintiff was not treated with a number of

significant pain medications.  Dr. Lloyd's diagnosis of fibromyalgia was never

provisional.  He first diagnosed Plaintiff as having fibromyalgia syndrome on April 17,

2003, and he did not again waiver from that diagnosis.  He found that she had a

"classic" case of this malady, often severe in presentation.  Unlike the evidence in

Phillips v. Barnhart, the record here has 25 medical entries of findings and treatment by

Dr. Lloyd.  Further, the case at bar does not have evidence of significant daily activities,

as was the situation in Phillips v. Barnhart.

While a course of "conservative" treatment is a potential good reason to discount

the opinion of a treating physician, here it is not.  Had there been *medical* evidence that

some other, more aggressive treatment was medically appropriate for care of a patient

with moderate to severe fibromyalgia, then the ALJ's reasoning might be proper.  But

there is no such medical evidence in this record.  The course of treatment that was

provided by Dr. Lloyd does not strike me as medically conservative.  It involved a significant number of muscle relaxants, sleep aids, and strong pain medications, continuously prescribed over two and one-half years.[22]  Moreover, the various prescribed medications did not significantly change the level of pain and fatigue experienced by Plaintiff.

The Administrative Law Judge also discounted Dr. Lloyd's opinion in part because it was based upon Plaintiff's subjective complaints and there were "few" objective findings.  This reasoning reflects a misunderstanding of the nature and treatment of fibromyalgia explained above.  Indeed, the court in Moore took pains to note that the ALJ in that case did *not* base a negative credibility determination upon the lack of objective medical findings, and therefore did not commit error in the way he considered the claim of disability due to fibromyalgia.  405 F.3d at 1212.  But more important, there is a distinction between the evaluation of a claimant's subjective testimony, as in Stewart and Moore, and the evaluation of the opinion of a treating physician.  The opinion of a treating physician, under the law, is entitled to great weight absent good reasons, while the testimony of a claimant is ordinary evidence and may be discounted for good reasons.

Finally, the opinion of Dr. Eckel was not substantial evidence to discount the opinion of Dr. Lloyd.  Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician.  Wilson v. Heckler, 734 F.2d

---

[22] A recommendation to lose weight or to exercise is "conservative" treatment in the ordinary case of lower back pain, but that is not the only treatment provided by Dr. Lloyd to Plaintiff.

513, 516 (11th Cir. 1984).  A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  Dr. Eckel examined Plaintiff on August 16, 2003, and there is no evidence that he had Dr. Lloyd's medical records to consider.  Dr. Eckel did not acknowledge that Dr. Lloyd had diagnosed fibromyalgia months earlier.  More important, Dr. Lloyd treated Plaintiff for *another two years.*  Surely Dr. Lloyd had a better understanding of the limitations imposed by Plaintiff's experience of fibromyalgia than Dr. Eckel.  It was error to substitute the opinion of Dr. Eckel for the opinion of Dr. Lloyd.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge do not correctly follow the law and his conclusions are not based upon substantial evidence in the record.  Since the Administrative Law Judge's reasons for disregarding the opinion of the treating physician, Dr. Lloyd, do not correctly follow the law and are not supported by substantial evidence in the record, this court must deem Dr. Lloyd's opinion to be true.  The vocational expert testified that there are no jobs in the national or local economy for a person with those limitations.  R. 350-351, 238.  Consequently, the decision of the Commissioner should be reversed and the Commissioner ordered to grant Plaintiff's claim for benefits.

If the court adopts the recommendation which follows, it need not address Plaintiff's second contention, that the ALJ failed to properly address Dr. Lloyd's opinions pursuant to the factors set forth in 20 C.F.R. § 404.1527(d).  Doc. 11, p. 22.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the

Commissioner **ORDERED** to **GRANT** Plaintiff's application for social security benefits.

**IN CHAMBERS** at Tallahassee, Florida, on January 24, 2008.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**